[No. 2640.   Dec. 27, 1922.  ˙ On Rehearing
Jan. Term, 1924]

## SMITH v. BORRADAILE, et al.

### SYLLABUS BY THE COURT

1. When evidence tending to establish adverse possession is conflicting, and there is substantial evidence to warrant the trial court in reaching its conclusion, that conclusion will not be set aside on appeal.

2. The duty arising between tenants in common, as to the common title, is based upon the principle of the unity of right of possession which exists as to each, and whether through common devise or grant or otherwise. One tenant in common, although in possession claiming adversely to his cotenant, cannot, by purchase of an outstanding tax certificate, issued upon taxes levied before he became interested in and in possession of the land, assert title to the whole, as against his cotenant, under the tax deed issued to him after his purchase of the certificate and at the close of the three-year period of redemption. The purchase of the certificate under such circumstances constitutes payment of the taxes by one whose duty it is to pay them, and such payment is for the benefit of all, subject to right of contribution. Case of Bradford v. Armijo (N. M.) 210 Pac. 1070, distinguished.

3. Rejection of proferred evidence on subject of laches held harmless.

4. Record examined and defense of laches held not established.

5. On appeal, the case will be considered upon the pleadings and issues as framed below.

6. Offers to prove certain facts made upon the trial

of the case, which offers state mere conclusions, are too general and were properly rejected.

Appeal from District Court, Bernalillo County; M. E. Hickey, Judge.

Suit to quiet title to real estate by James C. Smith against Dolores A. Borradaile, Anita A. Otero, and others. From a judgment awarding title to undivided one-half interest in the premises to the plaintiff and to the defendant Otero, respectively, plaintiff appeals. Affirmed.

Simms & Botts, of Albuquerque, for appellant.

The tax title is conclusive in favor of the plaintiff. State ex rel Old v. Romero, 181 Pac. 435; Pace v. Wight, 181 Pac. 430. This is not a case where one co-tenant, refusing to pay the taxes which he should pay, has sought to acquire a title against another co-tenant through a tax deed, but a case in which Smith, claiming the whole title in possession and desiring to strengthen his title, has bought the tax title. 26 R. C. L. 'Taxation," pars. 371 and 373; Bannon v. Brandon (Pa.), 75 Am. Dec. 655; 37 Cyc. p. 1347, note 41; Oswald v. Wolff, 129 Ill. 200, 21 N. E. 839; Griffin v. Turner, 75 Ia. 250, 39 N. W. 294; Lybrand v. Haney, 31 Wis. 230; Collier v. Smith (Ark.), 200 S. W. 1008; Welner v. Stearns, 40 Utah 185, 120 Pac. 490.

One co-tenant may become an adverse possessor against his co-tenant. Neher v. Armijo, 9 N. M. 325; Probst v. Trustees, 129 U. S. 182; 1 R. C. L. "Adverse Possession", par. 62; Smith v. Barrick, 182 Pac. 56.

The plea of laches against the cross bill is alone sufficient to determine this case in favor of the appellant. Patterson v. Hewitt, 11 N. M. 1; Haywood v. National Bank, 96 U. S. 611; Smith v. Clay, Amb. (English) 645; Harwood v. Railroad Co., 17 Wallace 79; Sullivan v. Portland etc., Ry Co., 94 U. S. 806; Galliher v. Cadwell, 145 U. S. 368; Penn. Mutual Life Ins. Co. v. Austin, 168 U. S. 685.

A. B. McMillen, of Albuquerque, for appellees.

Plaintiff's tax deed is illegal and void. The land in question was not assessed to the owners for the year 1903 as required by section 4026 of the Compiled Laws of 1897, but was assessed to Perfecto Armijo, the owner of but one-tenth interest in said land. Cooper v. Hills, 23 N. M. 696.

The territorial rate, as shown by stipulation on file in this case, was .01751, and the total assessed value $500. The total amount of tax for territorial purposes under said levy was $8.75, while the actual levy collected for territorial purposes was $17.78, or $9.03 in excess of the legal amount. The legality of such a tax was settled by the case of the Liberty Bell, 23 Fed. 843, and by the following authorities: Loan Association v. Topeka, 20 Wall. 655; 2 Dillon Municipal Corporations, 4th ed., sec. 914; Judson on Taxation, sec. 341.

In the case of Pace v. Wight, 25 N. M. 276, this court held that the curative provisions of Chap. 22 of the Laws of 1899 relative to tax sales do not apply to jurisdictional defects and that the fact that the property was sold for delinquent taxes is jurisdictional.

It must be obvious, also, that a valid tax is jurisdictional.

The law is settled by the highest authority that a tax illegal in part is illegal in toto, and it must necessarily follow that without an illegal tax there can be no legal sale. Cooley's Constitutional Limitations, star p. 521, Black on Tax Titles, sec. 230; Drew v. Davis, 10 Vt. 506; Elwell v. Shaw, 1 Me. 339; Buttrick v. Nashua Iron Co., 59 N. H. 392; Bangs v. Snow, 1 Mass. 188; Thurston v. Little, 3 Mass. 429; Dillingham v. Snow, 5 Mass. 547; Stetson v. Kempton, 13 Mass. 283; Haydon v. Foster, 13 Pick. 492; Torrey v. Millbury, 21 Pick. 70; Alvord v. Collin, 20 Pick. 418; Libby v. Burnham, 15 Mass. 144; Young v. Joslin, 13 R. I. 675; People v. Hagadorn, 36 Hun. 610; Dogan v. Griffin, 51 Miss. 782; Beard v. Green, 51 Miss. 856; Gamble v. Witty, 55 Miss. 26; Shattuck v. Daniel, 52 Miss. 834; Patterson v. Kittredge, 65 Miss. 33, 3 So. 65; Rougelot v. Quick, 34

Law. Ann. 123; Kemper v. M'cClellan, 19 Ohio 324; Younglove v. Hackman, 43 Ohio St. 69; 1 N. E. 230; Doe v. McQuilkin, 8 Blackf. 335; Noble v. Indianapolis, 16 Ind. 506; McLaughlin v. Thompson, 55 Ill. 249; Lacey v. Davis, 4 Mich. 140; Hammontree v. Lott, 40 Mich. 190; Wills v. Austin, 53 Cal. 152; Hardenburgh v. Kidd,. 10 Cal. 402; McGann v. Merriam, 11 Neb. 241, 9 N. W. 96; Gage v. Pumpelly, 155 U. S. 454, 462.

There was no authority vested. in the treasurer to sell the tax certificate issued to the County of Bernalillo. Pace v. Wight, 25 N. M. 276; Cooper v. Hills, 23 N. M. 696; Sutherland on Statutory Construction, sec. 463 and cases cited; 35 Cyc. p. 1208; Leette ·v. St. Louis State Bank, 115 Mo. 184, 21 S. W. 788.

The possession of Perfecto Armijo was not adverse in character, but was presumed to be the possession of all of his brothers and sisters. who were tenants in common. 38 Cyc. pp. 21 to 23; Long v. Grant, 163 Ala. 507, 50 So. 914; Sumner v. Hill, 157 Ala. 230, 47 So. 565; Inglis v. Webb, 117 Ala. 387, 23 So. 125; McNeil v. First Congregational Society, 66 Cal. 105, 4 Pac. 1096; Thompson v. Saunders, 113 Ga. 1024, 39 S. E. 419; Blackaby v. Blackaby, 185 Ill. 94, 56 N. E. 1053; Ball v. Palmer, 81 Ill. 370; Elliott v. Frakes, 90 Ind. 389; Patterson v. Nixon, 79 Ind. 251; Weare v. Van Meter, 42 Ia. 128; Schoonover v. Tyner, 72 Kan. 475, 84 Pac. 124; Vermilion v. Nichol (Ky.), 114 S. W. 270; Bloom v. Sawyer, 121 Ky. 308, 98 S. W. 204; Thornton v. York Bank, 45 Me. 158; Whitney v. Dewey, 15 Pick. 428; Nowlen v. Hall, 128 Mich. 274, 87 N. W. 222; Lindley v. Groff, 37 Minn. 338, 34 N. W. 26; Ller v. Routh (Miss.), 3 How. 276; Chapman v. Kullman, 191 Mo. 237, 89 S. W. 924; Southmayd v. Southmayd, 4 Mont. 100, 5 Pac. 318; Blake v. Milliken, 14 N. H. 213; Mott v. Carolina Land Co., 146 N. C. 425, 60 S. E. 423; Hogg v. Beerman, 41 O. S. 81; Moss v. Rose, 27 Ore. 595, 41 Pac. 666; Stull v. Stull, 197 Pa. St. 243; Richardson v. Day, 20 S. C. 412; Marr v. Gilliam (Tenn.), 1 Coldw. 488; Myers v. Frey, 102 Tex. 527, 119 S. W. 1142; Avery v. Hall, 50 Vt. 11; Cedar Mt. Consol.

Min. Co. v. Yarwood, 27 Wash. 271, 67 Pac. 749; Parker v. Brast, 45 W. Va. 399, 32 S. E. 269; Beinecker v. Miller, 40 Mo. 473; Thornton v. York Bank, 45 Me. 158; Mellon v. Reid, 114 Pa. St. 646, 8 Atl. 327; Phillips v. Wilmarth, 98 Ia. 32, 66 N. W. 1053; 38 Cyc. 27, 32 and cases cited.

That the exclusive receipt of rents and profits does not amount to an ouster, see: Morgan v. Mitchell, 104 Ga. 596, 30 S. E. 792; Carpenter v. Fletcher, 239 Ill. 440, 88 N. E. 162; Todd v. Todd, 117 Ill. 92, 7 N. E. 583; Higbee v. Rice, 5 Mass. 344; Rodney v. McLaughlin, 97 Mo. 426, 9 S. W. 726; Warfield v. Lindell, 30 Mo. 272; Lewitzky v. Szotoloff, 224 Pa. St. 610, 73 Atl. 936; Volton v. Hamilton, 2 Watts & S. 294; McGee v. Hall, 26 S. C. 179, 1 S. E. 711; Alexander v. Kennedy, 19 Tex. 488, 70 Am. Dec. 358.

Mere lapse of time or mere delay on the part of a tenant in common not in possession in failing to demand admission to joint possession or a share of the rents and profits is not sufficient to evidence an adverse holding by one in possession. Plass v. Plass, 121 Cal. 131; Bryan v. Atwater (Conn.), 5 Day 181; Milbourn v. David (Del.), 7 Houst. 209, 30 Atl. 971; Ball v. Palmer, 81 Ill. 370; Peden v. Cavine, 134 Ind. 494, 34 N. E. 7; Bader v. Dyer, 106 Ia. 715, 77 N. W. 469; Chambers v. Pleak (Ky.), 6 Dana 426; Lafavour v. Homan, 3 Allen 354; LaFountain v. Dee, 110 Mich. 347, 68 N. W. 220; Warfield v. Lindell, 38 Mo. 561; Abrams v. Rhoner, 44 Hun 507; Mott v. Carolina Land Co., 146 N. C. 525, 60 S. E. 423; Rider v. Maul, 46 Pa. St. 376; Villard v. Robert (S. C.), 1 Strobh. Eq. 393; Marr v. Gilliam (Tenn.), 1 Coldw. 488; Gray v. Kauffman, 82 Tex. 65, 17 S. W. 513; Purcell v. Wilson (Va.), 4 Gratt. 16; Reed v. Bachman, 61 W. Va. 452, 57 S. E. 769; Sydnor v. Palmer, 29 Wis. 226.

Courts manifest the utmost leniency when it appears that the delay is due to the intimate personal relations existing between the parties and the high degree of confidence reposed by one in another. 10 R. C. L. "Equity", sec. 149 and cases in note 11.

Plaintiff could acquire no right under a tax title as against his co-tenants. Black on Tax Titles, secs. 282 and 317 and cases cited; Flynn v. McKinley, 44 Ia. 68; Tyce v. Darbey (Ia.), 13 N. W. 301; Catron v. Laughlin, 11 N. M. 604 at p. 643; 7 R. C. L. p. 857, par. 51.

One cannot bring the owner of a legal title into equity and then cut off his legal right by pleading laches. Kelly v. Boettcher, 85 Fed. 62; Galway v. Metropolitan Elevated Ry. Co., 128 N. Y. 132, 28 N. E. 479 at p. 484.

The findings and decree of the court in favor of the defendant Anita A. Otero as to the undivided one-half interest in the real estate in question were based upon substantial evidence and are unassailable under the well known principle established by this court that where there is substantial evidence to support a decree the judgment of the court will not be disturbed. Territory v. West, 14 N. M. 546; Sherman v. Hicks, 14 N. M. 439; Richardson v. Pierce, 14 N. M. 334; Hancock v. Boazley, 14 N. M. 239; Territory v. Netherland, 13 N. M. 491; Candelaria v. Miera, 13 N. M. 360; Cunningham v. Springer, 13 N. M. 259; Ortiz v. Bank, 12 N. M. 519; Marquez v. Land Grant Co., 12 N. M. 445; Carpenter v. Lindauer, 12 N. M. 388; Green v. Brown & Manzanares Co., 11 N. M. 658; Rush v. Fletcher, 11 N. M. 555; Romero v. Boleman, 11 N. M. 535; Territory v. Gonzales, 11 N. M. 301; Gale & Farr v. Salas, 11 N. M. 211; Robinson v. Palatine Ins. Co. 11 N. M. 162; Patterson v. Hewitt, 11 N. M. 1; Badaracco v. Badaracco, 10 N. M. 761; Land & Irrigation Co. v. Gutierrez, 10 N. M. 177; Pueblo of Nambe v. Romero, 10 N. M. 58; Ford v. Springer Land Assoc., 8 N. M. 37; Territory v. Hicks, 6 N. M. 596; Torlina v. Trolicht, 6 N. M. 54; Lucy v. Woodward, 5 N. M. 583; Newcomb v. White, 5 N. M. 435; Romero v. Desmairias, 5 N. M. 142; Clark v. Carlisle Gold Mining Co., 5 N. M. 323; Rodey v. Traveler's Ins. Co., 3 N. M. 543; Zanz v. Stover, 2 N. M. 29.

Only the ultimate facts are to be found, and re-

quests of the trial court to contradict its findings of ultimate facts are not justified.

It is well settled that the findings required by statute are the ultimate facts. Burr v. Des Moines Co., 1 Wallace 102; McClure v. U. S., 116 U. S. 151; Luna v. R. R. Co., 16 N. M. 71; Texas Bank & Trust Co. v. Cavin (N. M.), 192 Pac. 367.

### OPINION OF THE COURT.

BARNES, J.  This is a suit to quiet title to certain real estate situate in Bernalillo county, and known as the Poblanos ranch, brought by the plaintiff, James C. Smith, against defendants Dolores Borradaile, Josefa A. Heyn, Ambrosio Armijo, Anita A. Otero, and all unknown claimants of interests in the premises adverse to the plaintiff.  Anita A. Otero answered, denying that plaintiff was the owner of the entire title to the real estate, admitted that plaintiff owned an undivided one-half interest therein, and alleged that she owned the remaining undivided one-half interest, title to which she prayed might be quieted in her as against the plaintiff.  The plaintiff replied, denying the claim of Mrs. Otero, setting up adverse possession since the year 1884 by plea of the statute of limitations of 10 years, and alleged that the plaintiff was a bona fide purchaser of the entire premises for value without notice of the claims of Mrs. Otero and her predecessors in title and illeging that she and her predecessors in title had been guilty of laches.

In order to understand some of the contentions advanced by plaintiff, it should be stated that the record discloses that the defendant Josefa Heyn was personally served with summons and copy of complaint on August 22, 1917, and a certificate of default as to her was issued on the 12th of September, 1917.  Defendant Ambrosio Armijo was personally served with a copy of summons on the 11th day of August, 1917, by delivering to and leaving with him in the county of Maricopa, state of Arizona, copy of summons with a copy of the complaint attached.  Upon such service a certificate of default was issued on December 4, 1917.

Defendant Borradaile was served with summons with copy of complaint attached on the 27th day of August, 1917, by personally delivering to and leaving with her such summons at the county of Alameda, in the state of California, and the certificate of default upon such service issued as to her on October 26, 1917. On the 4th day of September, 1917, defendant Anita Otero acquired by conveyance all the interest of Ambrosio Armijo in the premises in question, and on the 15th day of September, 1917, Mrs. Otero acquired by conveyance from Dolores Borradaile and Josefa Heyn all of their interest in said property. Mrs. Otero also claimed to have inherited a one-tenth interest in the property in question from her father upon his death in 1882, and a like one-tenth interest through the death of her sister, Rosalia Armijo. These two-tenths so gained by her through inheritance, together with the three-tenths acquired by conveyance from Ambrosio, Dolores, and Josefa, make up the undivided one-half interest in the premises which she claims in her answer.

No default judgment has ever been entered against any of the defendants upon the certificates of default.

It appears that Ambrosio Armijo, the father of Mrs. Otero, died April 10, 1882, in Bernalillo county, leaving him surviving ten children—Perfecto, Jesus, Teresa, Mariano, Elias, Dolores, Rosalia, Josefa, Anita, and Ambrosio. At the time of his death, five of his children were minors, namely: Dolores, age 15; Rosalia, age 13; Josefa, age 12; Ambrosio, age nine; and Anita, age 5. The deceased left a will which was duly probated giving to each of his ten children, among other things a one-tenth interest in the land in controversy. The widow of the deceased and his oldest son, Perfecto, were joint executors. Perfecto Armijo, the oldest son, went into possession of the land in question about the year 1882, and in the year 1912 conveyed it by warranty deed to Neil B. Field. From the year 1889 to 1912, Perfecto returned the land for taxation in his own name. In 1887 he leased the land to one Jones, who occupied it during the term of his lease. In 1890 he leased the land to one Standlee, who

occupied it during the term of his lease. In 1899 he mortgaged an interest in the land to one Harry Lee, which mortgage was afterward paid off. In 1911 he leased the land to James C. Smith, the plaintiff. Perfecto kept all of the proceeds of the land, and at various times during the years mentioned he lived on the land, farmed it, and kept the income. At the time Field bought the land in 1912, Smith was on it, and December 24, 1915, Field and his wife sold the land to Smith, who is this plaintiff, and conveyed the land to him by warranty deed. Smith made improvements on the land, built a house on it, costing approximately $1,400, and leveled some of the land and put it in cultivation. The land lies on the North Fourth street road out of Albuquerque, about 4 1-2 miles from town, and said highway has been greatly improved and paved with concrete by state and federal aid since Smith purchased the land.

The land was assessed for taxes to Perfecto Armijo for the year 1903. The taxes were not paid, and on the 3d day of October, 1904, the ranch was sold at tax sale to the county of Bernalillo. The certificate of said sale was held by said county until the 20th day of July, 1917, when it was sold to the plaintiff, and on the same day recorded. On the 22d day of September, 1920, Smith received a tax deed to the land.

Before Field bought the land in the year 1912, Perfecto had acquired, in addition to his one-tenth interest, the one-tenth interests each of his brothers, Jesus, Mariano, and Elias, and on August 1, 1917, the plaintiff Smith acquired from Teresa A. Pratt, formerly Armijo, and one of the heirs of Ambrosio Armijo, by a quitclaim deed, her one-tenth interest.

The plaintiff claims by adverse possession under the provisions of the act of February 1, 1858, which, for the purpose of reference, may be found as section 2938, C. L. 1897. As originally adopted, this section did not require the person in adverse possession to have color of title, but in 1899 (Laws 1899, c. 63) the Legislature amended the section so as to require color of title, and in 1905 (Laws 1905, c. 139) the

original section was further amended by adding a definition of adverse possession. There are two statutes of adverse possession in this state, one of which is the section referred to, and the other of which, for convenience of discussion in this opinion, may be referred to as section 2937, C. L. 1897. The latter section applies to grants derived from the governments of Spain and Mexico.

It is admitted in the record that the premises in question were originally part of the Elena de Gallegos land grant, known as a Spanish grant, but, without determining at this time under which of the sections mentioned above the adverse possession of the plaintiff could ripen into a legal right, the court will, for the purpose of the opinion, adopt the contention of the plaintiff, summarized as follows: That Perfecto Armijo entered into adverse possession of the premises in 1885 (1882 in the testimony); that such possession was open, visible, notorious, adverse, exclusive, and uninterrupted after such entry for 10 years; that no color of title was required to ripen such possession; and that the rights of the adverse claimant had fully accrued under the provisions of section 2938 before the act of 1899 had required color of title as an element of adverse possession.

Turning to the transcript in the case it is fairly deducible therefrom: That the property was at the time of the death of the ancestor a large and well-known farm or hacienda, improved by a dwelling which is described in Mr. Field's testimony as being a 'show place'' at the time he first knew it, and having cultivated fields. That in 1882 Perfecto, who was one of the executors of his father's will, moved onto the premises and lived there for various periods down to the year 1911, when he leased the premises to the plaintiff. That during all those years he retained the possession and management of the property, returning it for taxation in his own name from the year 1889, and paid the taxes on it, excepting for the year 1903, and unquestionably exercised full dominion over the entire property until such time as he delivered a con-

veyance of the whole thereof to Mr. Field. He received the rents, issues, and profits of the fields while he lived on the place, and never accounted to his coheirs therefor, nor paid them any part thereof, and the three of the heirs who testified in the case admitted that they never demanded an accounting, nor received anything on account of the product of the land. In 1887 he leased the entire premises to one Jones, and in 1890 he leased to one Standlee, and in 1911 he leased the premises to the plaintiff, and if there were any profits arising under any of these leases they were appropriated by Perfecto to his own uses. In 1899 Perfecto and wife executed a mortgage to Harry F. Lee. This mortgage described and covered certain property not in question in this case and also "all of their right, title, and interest in and to that certain property * * * commonly known and called the Las Poblanos ranch, and being the same property on which parties of the first part now reside."

Mr. Field testified: That in the fall of 1885, or the spring of 1886, Perfecto Armijo was living on this ranch. "I can't be certain of the date—any more certain than that—and claimed to be the owner of it, offered to sell it to me at that time," and "stated that he had become the owner of it by reason of the fact that he had made advances to the extent of several thousand dollars for the heirs in the prosecution of certain Indian depredation claims. That the claim by Perfecto Armijo was well known to and acquiesced in by his adult brothers and sisters." Upon objection of the defendant, the statement of Mr. Field that the claim was well known to and acquiesced in by Perfecto's adult brothers and sisters was stricken out.

The plaintiff also introduced in evidence the record in a suit for partition, No. 3187, Bernalillo county district court, which was a suit brought by Mr. Field for Perfecto Armijo and the heirs Dolores, Rosalia, and Teresa for themselves, and Abundia Garcia de Barela, Josefa, Ambrosio, and Anita, the last three being infants, all as tenants in common of certain property in the petition described, all situate in the town of Albu-

querque, and praying partition of such Albuquerque property. A decree of partition was entered as to such property, and the purpose of plaintiff in introducing the record is to show a condition under which it is to be presumed that the Las Poblanos ranch was treated and considered at the time the suit was filed in 1891 as the settled and separate property of Perfecto.

The pleadings in this case referred only to Albuquerque city property, which they prayed to have partitioned. The complaint alleges that the Armijo heirs have no other source of income than this city property and in the proofs some of the heirs admitted they are satisfied with the shares in their father's estate as apportioned to them by the proposed decree, which afterward became final. The minor heirs appeared by a guardian ad litem, who filed the usual plea requiring full proof of the allegations of the complaint.

Mr. Field also testified that Perfecto sold a portion of the Poblanos ranch to a man named Garcia, who, with his subsequent grantees, have been in possession ever since the sale.

On the other hand for the defendants, Josefa Heyn, one of the defendants, testified: That she was the daughter of Ambrosio Armijo, born in 1870; knew that her brother lived on the ranch; heard at the time that he sold it to Mr. Field and went with Mrs. Borradaile to her brother's house to claim their share, and her brother said: "We didn't have any share in it." This was shortly after the property had been sold to Mr. Field; Mrs. Borradaile did the talking. She said: "What about Las Poblanos ranch—I heard that you sold it." He said: "Yes," and she said: "Well, where is our share?" He answered: "I only sold mine; I didn't sell yours." That Perfecto never at any time prior to that claimed that he was the sole owner; never heard he so claimed; never was any conversation in the presence of herself and Mr. Field that Perfecto claimed to own the whole ranch; never heard of Perfecto's claim on account of prosecuting Indian claims. On cross-examination she admitted she never

returned the property for taxation or paid taxes. Her husband was assessor of the county for four years and paid no attention to taxes on the property; did not consider that ranch was Perfecto's or that she had no interest in it; knew Perfecto was leasing it and never got any money; always thought that she had an interest, and if Perfecto sold he would give us our share; did not object to his selling and expected to get her part of the money; never brought any suit after the sale to Mr. Field. On redirect examination she testifies that Perfecto and the rest of the children were always on good terms; was no reason why she did not demand part of the income or rents from Perfecto; was no understanding about taxes—"We just thought if he lived there he ought to pay the taxes."

The deposition of Dolores A. Borradaile stated: That she was 50 years of age and the daughter of Ambrosio Armijo. Lives in Berkeley, Cal., where she went in June, 1914; very familiar with the ranch; her brother took possession of it immediately after her father's death; lived there off and on from 1882 to 1912, and when not on the place he rented it. Prior to 1912 never told her he claimed to be the owner of the entire ranch; never told her prior to 1912 that she had lost her interest therein, or had no interest therein. He never asked her to contribute towards payment of taxes or repairs or improvements. Didn't ask him to pay over her part of rents because he was living on the place part of the time, and he paid the taxes and made the improvements, and felt he was entitled to keep the rents in repayment. No one ever told her prior to 1912 that her brother claimed to be sole owner.

"After the ranch was sold, when I claimed my interest, I claimed from my brother my interest in the money obtained from the sale, and it was then for the first time that my brother Perfecto ever disputed my interest and claim in the property. I asked him for my share of the selling price, and he said that I had no right in the property—that he lived on it for 25 years or over and that he had paid the taxes and repaired it, and that I had lost my claim in it. The conversation ended there, as I didn't at

that time wish to have any quarrel with my brother about the matter. I didn't, however, agree that his claim was correct."

Upon cross-interrogatories she answered that it was not within her knowledge that the partition suit was brought for the purpose of partioning all the real estate in Bernalillo county. The ranch in question was not included in the suit for the reason—

"My brother was living on the place at the time and I thought as long as he lived in the place it would not be divided, but when it was sold, the proceeds could be divided amongst us."

There was no agreement made by her with Perfecto Armijo, or with any other person, that the receipt of the lots (in the partition suit) was in full of her share of the real property of her father's estate. She did not set up claim to the ranch in the partition suit because she did not desire to disturb her brother then living on the ranch, and because the ranch was not mentioned in suit, nor brought up, nor discussed.

Anita A. Otero testified by deposition that she was 42 years of age, lives in Berkeley, Cal., daughter of Ambrosio Armijo; is familiar with the Las Poblanos ranch; doesn't know who was in possession immediately after her mother's death, as she was only five years old. Her brother remained in possession until 1912; never told her he claimed to own the entire ranch, and never told her prior to 1912 that she had lost her interest therein. He never asked her to contribute to payment of taxes or improvements. He received the rents, but she never asked him for any portion of them because he was her brother, and she thought he would do the right thing by her in the end. Prior to 1912 she never received information from any source leading her to believe her brother claimed her interest in the land, when—

"I wrote him a letter demanding my interest in the ranch, he answered that if I claimed an interest to go ahead and fence in whatever were my rights in the land."

On cross-examination she admits: That Perfecto rented the ranch to Jones; didn't know of lease to Standlee, nor mortgage to Lee, nor lease to Smith in 1912. Never received any rent under those ·leases. Never made any contribution for taxes as her brother received rents from ranch, and she didn't think it was necessary for her to contribute; heard of sale to Field and made inquiries through her agent in Albuquerque. Perfecto gave her no part in the purchase price. Made no demands upon Field or Smith as she didn't understand Field or Smith ever owned the ranch as she always claimed her interest. Perfecto owed her money in 1912. There are several other matters he never settled with her.

The defendant also offered in evidence the records of deeds, first, from Mariano Armijo and wife to Perfecto Armijo, dated December 15, 1884, conveying for the consideration of $500 all of the interest of the grantors in Las Poblanos ranch, and second, the deed of Jesus B. Armijo to Perfecto Armijo, dated December 15, 1884, conveying for the consideration of $500 his interest in the Las Poblanos ranch, described as "his whole one-fifth interest."

The judgment of the court below awarded title to undivided one-half interests in the premises to the plaintiff and the defendant Anita A. Otero, respectively.

[1] 1. Before considering the effect of the proofs offered, it may be well to state the rule as to entry, possession, and ouster, or adverse possession, as between tenants in common. The language of Judge Story in Clymer's Lessee v. Dawkins, 3 How. 674–689 (11 L. Ed. 778), which was a suit arising upon a tenancy in common, is a correct statement of the rule:

"It is true that the entry and possession of one tenant in common, of and into the land held in common, is ordinarily deemed the entry and possession of all the tenants; and this presumption will prevail in favor of all, until some notorious act of ouster 'or adverse possession by the party so entering into possession, is brought home to the knowledge or notice of the others."

It is clear that there was no physical act of ouster on the part of Perfecto as against his coheirs and cotenants prior to the year 1912, when he conveyed the whole property to Field. This conveyance and the subsequent possession of Field and his grantee, Smith, constituted an ouster as to any other person claiming an interest in the premises. Neher v. Armijo, 9 N. M. 325, 54 Pac. 236. The question then remains, was there anything in the circumstances of his possession that would give notice to his cotenants that such possession was hostile, adverse, and under claim of right? The mere possession itself and payment of taxes is presumed to be for the benefit of all, and appropriation of rents and profits does not constitute adverse possession. Tiedeman, Real Prop. § 498; 45 Cent. Digest, par. 2665; Tiffany, Real Prop, par. 2014; 7 R. C. L. Cotenancy, pars. 43 and 47; Warfield v. Lindell, 30 Mo. 272, 77 Am. Dec. 614, and note; Bolton v. Hamilton, 2 Watts & S. (Pa.) 294, 37 Am. Dec. 509, and note. Pillow v. S. W. Va. Imp. Co., 92 Va 144, 23 S. E. 32, 53 m. St. Rep. 804; Gillaspie v. Osburn, 3 A. K. Marsh. (Ky.) 77, 13 Am. Dec. 136, and note. Nor does appropriation of rent for a long term of years raise a conclusive presumption of adverse possession. Warfield v. Lindell, supra—26 years; Bolton v. Hamilton, supra—50 years. And the presumption is for the jury. Id. and Freeman, Cotenancy and Partition, § 238.

The mortgage executed to Lee covered only the interest of the mortgagor and his wife in the ranch, and therefore fails to raise even a presumption of adverse claim as to his cotenants. The execution and recording of a mortgage upon the whole property, standing as a solitary evidentiary fact, would not have constituted notice of adverse possession. Leach v. Beattie, 33 Vt. 195.

It is urged in plaintiff's brief that, under the proofs, something resembling a family settlement was had, under which the right of Perfecto to the entirety of the premises in question was recognized and acquiesced in. This situation, if it existed, could

arise only by virtue of the consideration or claim aris-
ing out of the advances testified to by Mr. Field as
made by Perfecto, in prosecuting for the benefit of
the family certain Indian depredation claims. There
is no other basis for assuming that such a family set-
tlement was reached, supported by any consideration
or thing of value advanced by Perfecto, and there is
no direct proof that such an arrangement was ever
entered into. As against the presumption of the
family arrangement, appear the facts that Perfecto's
entry into possession in 1882 was peaceable and not
adverse; that on August 26, 1883, he signed and filed in
the probate court a document setting aside the
"higuelas," or land interests in this ranch, to the
heirs; that on December 15, 1884, he bought, from
two of his adult brothers for the consideration of $500
paid to each, their respective interests in the ranch;
that in 1899, in order to secure a loan of $363, he
pledged by a mortgage, along with other property, his
right, title, and interest in the ranch at a time when
under the contentions of the plaintiff, his title to the
entire ranch had ripened by adverse possession; that
in 1917 Ambrosio Armijo, 2d, executed to Anita A.
Otero a warranty deed for his interest in the ranch,
conveying to her all of the ranch; that the three heirs,
in testifying as witnesses, denied any family agreement
or knowledge of his claim to the entirety of the prop-
erty under the Indian depredation advances, or else
denied in general terms that they had entered into any
agrement under which Perfecto was to hold the ranch
as his own. It is true it appears from the undis-
puted testimony that Perfecto sold a portion of the
ranch to one Garcia, and that Garcia and his succes-
sors in title have held possession of the tract they so
acquired ever since the sale. But it does not appear
when this sale was made, for what consideration, or
what the value or extent of the tract sold was. This
testimony, standing as it does as to the Garcia tract,
is too vague to add weight to the plaintiffs conten-
tions.

The whole question of adverse possession under
the law referred to as section 2938, or under the law

referred to as section 2937, is a matter of controversy and dispute under the testimony in the case, and there is substantial evidence in the record to warrant the trial court in reaching its conclusion that the plaintiff had failed to establish adverse possession as against the defendant. Under the authority of many cases decided in this court, the finding and judgment of the trial court will not be set aside under such circumstances. Woodward . v. Libbey, 27 N. M. 683, 205 Pac. 524.

The court property held adversely to the plaintiff upon his claim of adverse possession under section 2938 and in favor of defendant Otero. Can the plaintiff sustain his title as superior to the Otero title under section 2937? Clearly not, as his earliest deed of conveyance, grant, or other assurance, which could be color of title as against the Otero interests, is the deed to Field executed five years before suit.

[2] 2. Plaintiff offered in evidence a tax deed, acquired in 1920, shortly before the trial of this case below, and claims title thereunder in fee simple to the entirety. His complaint is in the usual form in suits to quit title, and advises defendants of nothing other than that he claims the premises as the owner thereof. Defendant's objections to the offer of the tax deed, and the tax certificate and record on which it was founded are not based upon the fact that the instruments and records show a title, if any, acquired by plaintiff since the beginning of his action, but are based upon technical objections to the tax levy and the power of the county treasurer to assign the tax certificate, and upon the proposition that plaintiff was a tenant in common at the time the tax certificate was purchased, and that such purchase constituted a payment of the taxes and inured to the benefit of his cotenants, and therefore did not aid plaintiff in his suit. This case is to be distinguished from the case of Bradford v. Armijo (N. M.) 210 Pac. 1070, because, in the latter case, plaintiff expressly disclaimed any other purpose in offering his tax deed excepting as

establishing color of title under the adverse possession statutes.

It will be seen that plaintiff here, under the state of the pleadings and issues as made at the trial of the case, can maintain his tax title to the entire premises, unless defendant's objections to such title are well founded. As shown by and summarized from the record, plaintiff's position in regard to this tax title is as follows: Field took from Perfecto Armijo in 1912 by warranty deed, conveying the whole, and there-after Field and his successors in interest were under an open an divisible act of ouster continuously in adverse possession of the entire premises within the definition of adverse possession as given by the statute of this state (section 3365, Code 1915); in 1904 Perfecto Armijo, then being in possession of the whole premises and a tenant in common with defendant and those from whom she deraigns title, returned such premises for taxation. The taxes remained unpaid and in 1905 they were struck off to Bernalillo county at a tax sale. The plaintiff bought Field's title in 1915 and in 1917 bought a tax sale certificate from Bernalillo county based upon the unpaid taxes of 1904, and in 1920 obtained a tax deed upon such certificate for the whole of the premises.

The first question, independently of any defects that may be urged against the tax levy and sale, is, can the plaintiff under the circumstances of this case maintain title under this tax deed? The general proposition, which the cases from our state support, is that the tenant in common cannot acquire an outstanding tax title and maintain it to the exclusion of his cotenants, as the transaction amounts only to the payment of taxes for which the payor is entitled to contribution from his fellow tenants. Freeman, Cotenancy and Partition, § 158; Black, Tax Titles, § 141; Ruling Case Law, vol. 7, p. 863, § 57, and note; Catron v. Laughlin, 11 N. M. 604, 72 Pac. 26. This principle of the law of tenancy in common is supported on two theories, one being the duty developing upon every owner of property, and therefore upon each

tenant in common, to pay to the state the taxes there-
on, and the other being the confidential relation ex-
isting between tenants in common, by reason of their
their mutual relations towards each other and towards
the common property and title therein.  This is ampl'
illustrated and supported by the language of the cases
cited and the text of the section from 7 R. C. L.,
supra, and cases cited in note to Hoyt v. Lightbody,
116 Am. St. Rep. 367.  In said note, citing, inter alia,
Venable v. Beauchamp, 3 Dana (33 Ky.) 321, 28
Am. Dec. 74, the reason for the rule is given as fol-
lows:

"The rule inhibiting the assertion of an adverse tax
title by one cotenant against another is said to be based
upon a community of interest in the common title between
persons having a common possession, and a common in-
terest in the safety of the possession of each, whereby such
a relation of trust and confidence is created between the
parties that it would be inequitable to permit one of
them to do anything to the prejudice of the other in
reference to tax titles to the property so situated."

This language is quoted with approval by Mr.
Black in his work on Tax Titles on page 350.  The
books show many exceptions to this rule.  Those ex-
ceptions are gathered in a note to Hoyt v. Lightbody,
supra, and a note to the same case to be found in 8
Ann. Cas. beginning on page 988.  One of the excep-
tions is where the tax title has become complete and
perfected in a stranger before the cotenant claiming
thereunder had acquired the same, but this exception
is manifestly outside the facts in the present case.
Another exception is where the tax title has been pur-
chasd by a cotenant holding adversely to his co-owners.
Another exception is where there has been a separate
taxation of the interests and no general duty devolves
upon one cotenant to protect the interest of another
with regard to the discharge of the taxes.  Another
is where the titles derived by cotenants came from
different sources, where it is said that the condition
establishing a confidential relation between them with
reference to the title, that is to say, a fiduciary or
trust relation, does not exist.

Under these conflicting decisions it is apparently necessary to discuss only the first, second, and fourth class of cases, and it would seem that a general and controlling principle may be evolved if we determine what are the duties of tenants in common towards each other and when and how those duties arise. Mr. Freeman, in his work on Cotenancy, says, in paragraph 86:

"It is a sufficient description of tenants in common to say that they are 'persons who hold by unity of possession. It is not necessary that there should be either unity of tenure in the different portions of the land, or unity of estate in the several owners thereof, to constitute a tenancy in common. Unity of right of possession is merely all that is required'."

Bearing in mind this definition of the principle essential to support a tenancy in common, the question as to the duty existing between tenants in common towards one another under such unity of possession becomes the essential factor. In Texas, among other states, the fourth exception to the general rule mentioned above has been settled by the decisions of the courts as well founded, and has become the law of property in that state. But in Fielding v. White (Tex. Civ. App.) 32 S. W. 1054, Mr. Chief Justice Fisher said that, if the question were an open one, he would be inclined to rule differently and in accord with what he conceived to be the decided weight of authority, and further said:

"The unity of possession, or the right of joint possession, was the principal factor that created the relationship of tenants in common at common law. Their rights were acquired by several and distinct titles, or by the same title but at different periods; and the grand incident of such estates was the unity of possession, or the present right of possession, co-extensive with the entire estate. And in my view of the law, when such relationship is once ascertained, or such estates are found to exist, eo instante there springs into existence a reciprocal and mutual obligation and duty resting upon each co-owner, in dealing with the common estate, to observe the right of each other, and to abstain from acts in which benefit and profit may result to one of the injury of the other, although there be an absence of facts tending to show special circumstances creating trust relationship."

This would appear to be a clear and indisputable statement of the duty existing between tenants in common and of the basis on which that duty rests. Other duties may arise through contract or by force of circumstances, but the common duty as above defined fully supports the general rule as to the conduct of the co-owner towards the common property and title. Some of the cases seem to impose a superior duty to protect the common title upon the cotenant in possession. These cases are decided almost without exception under taxing acts that, by their terms, impose a prior obligation to pay the taxes upon the person in the actual possession and occupancy of the land, or upon the theory that one in possession and enjoyment of the rents and profits is bound by such conditions to a higher duty towards the cotenant out of possession. Possession and occupancy of real property in New Mexico raise no special obligation to pay the taxes thereon. The receipt by a cotenant in possession of the rents and profits of the common estate creates no other liability than that of accounting to those jointly interested with him; but it would seem that from the opinions in the cases of the two classes last referred to there has arisen a misconception of the basis of duty to pay the taxes on the common property. This court considers that duty to arise from the unity of possession and to arise as and when such unity is cast upon the holder of a title to the moiety. From this view of the cases it becomes immaterial whether the taxes were levied before or after the plaintiff bought into the estate, or whether he was, at the time the tax certificate was acquired and the tax deed issued to him, holding adversely to defendant or not, or whether his title in fact came from a different source than that of the defendant, or arose through a common devise or grant.

In Cecil v. Clark, 44 W. Va. 659—683, 30 S. E. 216, 225, the court, in a carefully considered opinion, says

"Therefore I say that when one person, who in law is a cotenant, purchases another title to the land, he purchases for the benefit of all. He may claim that he is the

sole owner, but if, in fact, the law will hold him to be not sole owner, but a tenant in common with others, that purchase is for the common benefit of all. The test is, does the law adjudge him to be a tenant in common."

See, also, Hoyt v. Lightbody, 116 Am. St. Rep. 367, where the tax title based upon taxes levied before the title holder had come into the cotenancy was denied. See, also, Lomax v. Grindele, 117 Ill. 527, 7 N. E. 483. See, also, note in 19 L. R. A. (N. S.) to Jackson v. Baird, p. 591, where a large number of cases are collected.

Many cases have considered the duty or obligation as to the common estate existing between tenants in common from the standpoint of a sort of confidential relation said to arise by reason of their common ownership, and have denied that such confidential relation exists where the several cotenants derive their title from different sources. But as this confidential relation arises by operation of law upon the arising of the unity of possession, these cases would appear to confuse effect for cause and to deny the distinguishing feature of tenancies of this character as defined by the books. Freeman, Cotenancy and Partition, § 86. There is also a class of cases sustaining tax titles bought by one tenant in common and asserted by the purchaser adversely to the interests of his cotenants, where the tax title, under the local statutes, had ripened in a complete title before the purchasing cotenant had acquired the same. These cases go on the theory, as stated in the case of Boynton v. Veldman, 131 Mich. 555, 91 N. W. 1022, that no duty to pay the taxes rested upon the purchaser of the tax title, or upon the theory, which is based upon a mere substantial principle of law, that the tenancy in common had been ended by the vesting of title to the entirety in the person of the original owner of the tax title, this being the reasoning of the Pennsylvania cases followed in the courts of some of the other states. As the facts in the case at bar present a different situation from those in the cases just referred to, we expressly reserve a decision upon those principles.

38 Cyc. at pages 50, 51, lays down the bald prin-
ciple that one owning an undivided interest in land,
adversely claiming title to the whole and being in
actual possession thereof, may purchase a tax title
without its inuring to the benefit of his alleged
cotenant. The two cases cited in support of this propo-
sition do not, we submit, bear out this statement.
Willcuts v. Rollins, 85 Iowa, 247 N. W. 199, turns
primarily upon the question of five years' possession
and also discloses in the opinion facts in themselves
sufficient to defeat the claimant under the tax title.
In Alexander v. Sully, 50 Iowa, 192, it appears from
the opinion that the superior title had been vested in
a stranger for two years, but the former joint owner
purchased it, and, as the court said, the question was
whether the joint ownership previously existing was
not dissolved by this superior title, and said:

"If the superior title did not in and of itself, amount
to an ouster and eviction, we think the principle, under
the circumstances, must be the same as if it did have that
effect. As neither of the joint owners was in possession,
the outstanding title was not purchased to protect the
possession or any other right either of the former joint
owners then had."

Upon the second exception to the rule it may be
said: The plaintiff in this case deraigns title and
possession through that of his grantor, Field, whose
deed, under which he took possession, and whose pos-
session were adverse to the tenancy in common from
1912. This adverse possession had not ripened into
a title under the statute as against co-owners in the
estate at the time plaintiff brought this action. A
number of cases hold in effect that a tenant in com-
mon, entering and claiming and holding all the premis-
es adversely to the other cotenants, is not barred by
virtue of the existence of cotenancy, as a condition
imposed by law, from acquiring and asserting for him-
self an outstanding tax title. The case of Wright
v. Sperry, 21 Wis. 336, would appear to support this
doctrine, but an examination of the facts in that case,
as shown in the opinion, reveals that the case is slight
authority for sustaining this plaintiff's title under

his tax deed. In the Wisconsin case the tax title to all of the land had vested and become paramount before doctrine the tenancy in common had terminated. The Wisconsin case also supports its reasoning under which it approves the tax deed purchased by one tenant in Wright purchased it, and under the Pennsylvania common by a wrong analogy, saying:

"Certainly it is not unreasonable so to hold, if he may, without such outstanding title, by merely entering into possession of and claiming the whole land, acquire by adverse possession a perfect title to the whole, unless his cotenants within 20 years commence an action against him."

Freeman, in his treatise on Cotenancy and Partition, section 153, says of the rule that a cotenant cannot assail the common title, and, speaking of adverse possession by a cotenant:

"This though apparently an exception, is, upon close examination, found not to involve any violation of the general rule. for one cotenant who defends an action brought by another, on the ground that the latter is barred by this statute, concedes the title of the cotenant and seeks to avoid it for not being asserted in proper time."

Does the fact of adverse possession in the plaintiff in this case, although known to defendant, place him in any better or superior position as to his tax title, before such adverse possession had continued for the period of ten years necessary to constitute a defensive right under our statute? We think not. Whether all the cotenants, or part, or none, are in possession does not affect the rule, and to hold that one cotenant may, by his own act of ouster, abrogate the rule and by an adverse and hostile claim, continued for a day, or week, or any period less than that fixed by the statute of limitations, gain a right to pay the common taxes and then deny the common duty, is to abridge the spirit, if not the letter, of the rule, and to · open the door to overreaching and fraud. To establish the rule of duty between tenants in common, as to the common title, upon the existence of the unity of right of possession alone will not by any reasoning

reconcile the reported cases, but it should distinguish
many of the inappropriate analogies referred to in
such cases, tend to settle the true rule by whcih such
duty is to be determined, and cast no new or unreason-
able burden upon such tenancies.

The exact question being undetermined in this state,
and this court believing that the correct basis of the
duty of one cotenant to his fellow rests upon the
principle of unity of possession or unity of right of
possession, as it may be better expressed, and such
unity having been in existence, as between plaintiff
and defendant at the time plaintiff bought
the tax certificate, we hold that such
purchase was a mere payment of the taxes and re-
demption of the property from the tax lien by one
charged with the duty to pay the taxes, and therefore
such payment and redemption inured to the benefit of
the defendant and her grantors, all tenants in com-
mon with the plaintiff, and that the plaintiff gained
nothing through the delivery to him of the tax deed
issued upon such certificate of tax sale, beyond the
right of contribution from the other tenant in com-
mon.   Having reached this conclusion as to the effect
of the tax deed, it is unnecessary to consider de-
fendant's further objections to it.

[3, 4]  3, 4.  One of the defenses urged by plain-
tiff to the cross-complaint of defendant is that de-
fendant and her grantors are guilty of laches and
should not be permitted to recover in this equitable
action.   Plaintiff says that he bought the land in suit
in good faith for a valuable consideration, without
knowledge of defendant's claim; and that he and his
predecessors in title have been in actual, exclusive,
hostile, and adverse possession of all the land since
1884, claiming to own it in fee, and in good faith
have made valuable improvements thereon, all as was
well known to defendant and her predecessors in title;
and that she and they have been guilty of laches in
that they have not asserted their rights for over 30
years, and their demand is stale, and the position of

the parties is now such that it would be inequitable and unconscionable to permit her to recover any part of the land. These allegations are contained in plaintiff's reply to defendant's cross-complaint, and constitute an answer to the cross-complaint setting forth new matter. Defendant failed to file any demurrer or answer to such new matter, but on the trial below it was considered as denied, and it will be so considered here. The trial court evidently failed to give consideration to this defensive plea, for it limited the evidence introduced by plaintiff so that it could not be considered under this issue and excluded offered evidence. However, upon the examination and cross-examination of plaintiff, all of the evidence on this issue, with one exception to be later noted, is in fact fully developed in the record. Therefore the condition of the record works no hardship on the plaintiff on appeal, unless the exception noted was harmful. Plaintiff relies on 30 years' lapse of time during which he says defendant failed to assert her rights. The analysis heretofore made of the evidence introduced upon the issue of adverse possession shows a sufficient reason for such nonassertion of right on the part of plaintiff and her grantors as against Perfecto. It is said:

"Courts manifest the utmost leniency when it appears that the delay is due to the intimate personal relations subsisting between the parties and the high degree of confidence reposed by one in another." 10 R. C. L. Equity, § 149, and cases in note 11.

This condition of intimate personal relation and high degree of confidence existed between defendant and her elder brother Perfecto up to the time he sold to Field in 1912. The element of waiting in silence for a possible speculative increase in value of the property is entirely absent, and defendant may be presumed under the proof to have lost rather than to have gained by her silence up to the time of the sale in 1912. A new condition then arose. Plaintiff says he bought the whole of the land in good faith and without knowledge of defendant's claim. In view

of the fact that the interests now claimed by defendant arise under a will shown to have been duly admitted to probate in the court of record of the county where the property is situate, which records are the only ones required by law with reference to title arising by inheritance or devise, and that such records are commonly consulted in ascertaining the condition of ancient realty titles, plaintiff's allegations of good faith and of ignorance are entitled to little weight in his behalf, and that is particularly so when his own testimony shows that he asked John Borradaile, husband of one of the Armijo heirs, about this title just before he bought in 1912. The testimony is as follows:

"A. Well, Mr. Borrodaile and I had a little conversation. I asked him about title; that is what you want to know, is it?

"Mr. Simms: Yes.

"A. It was good.

"Q. Title to what? A. Title to this Perfecto Armijo Poblanos property.

'Q. All right; go ahead. A. He says I consider it as perfectly good. He says the title is good.

"Q. What else did he say? Give the whole conversation. A. He says, 'Well some of the heirs have never been settled for. We don't figure that we have got any interest.' He said, 'Perfecto just simply beat us out of it—stole it from us.' "

If Smith relied upon Borradaile's opinion of the title, he did so at his peril and can hardly convince the court of the good faith of a purchase ventured on the contradictory statements which formed and shaded such opinion. Smith stands charged by his own admissions with making inquiries as to the title at a time when he was about to buy, and of a person who had no interest in the land, and of a total failure to inquire of those whose interest might be adverse to Field's title. In other words, he knew of dormant claimants, but feared speech with them might vitalize both claimants and their claims. Shortly after the purchase by plaintiff in 1915, he built a house costing $1,400 to $1,500, built sheds and corrals, and leveled land at a cost not to exceed $900, all before he brought suit. Other improvements made by him since suit are shown, but their value is not material to the issue here.

A state highway passing by the land was built since the suit, which plaintiff claims has, to an undisclosed degree, appreciated the value of the land. Defendant never notified plaintiff that she claimed an interest in the land, or brought any suit until the filing of her cross-complaint herein. Do these facts state a case where it would be inequitable and unconscionable to award defendant the interest she claims? We think not. Plaintiff and his predecessers in 1912 were in possession of the land and enjoying the income therefrom. His improvements were only such as aid the beneficial use of the land for cultivation and residence, and, even should he lose one-half their value, he can hardly be found on the wrong side of the balance sheet as to his whole enjoyment of the premises. It is true he loses in speculative gain on a purchase based on Borradaile's opinion that Perfecto's title was a robber's title, though such loss can hardly be urged in equity.

This brings us to the proofs excluded on this issue. Plaintiff offered to prove that he paid Field in 1915 $50 per acre for the 126 acres of land—$6,300. for the whole estate then delivered to his possession—and that it had greatly appreciated in value at the time of trial. This offer was denied. Did this denial constitute harmful error. We think not. Plaintiff's offer did not show the extent of the increase in value or disclose that the possession of such increase was such as he was entitled to rely upon. It is true that, in the anxiety and pressure of a critical moment in a trial before a court, whose rulings are adverse, something should be allowed to counsel in considering on appeal the manner in which the record is made below. But in this particular instance the proffered proofs were either greatly probative or immaterial upon the issue at stake, and the burden and duty were on counsel to submit his proofs fully so that they might be fairly weighed and considered by the courts. In this he failed. But, waiving the question as to the form and sufficiency of plaintiff's offer, it may be said there is sufficient in the record so that the purpose and effect of the offered

evidence can be understood and fairly considered. The description, extent, and value of the improvements and the times when they were placed on the property are shown in the record, and no increase in value such as would shock the conscience or present a grave inequity based upon the five years' silence and inactivity of defendant regarding her claim to an interest can be presented. The principles on which Patterson v. Hewitt, 11 N. M. 1, 66 Pac. 522, 55 L. R. A. 658, was decided are absent here. There is no speculative element of loss through costly mine development, or of disproportionate gain through fortuitous discovery of great mineral wealth, such as effected the conscience of the court in that case. One of the inequitable features arising under the assertion of stale claims is the disappearance through lapse of time of witnesses to essential facts, and all other forms of proofs necessary to establish the truth concerning the facts in litigation. That was a moving ground for the decision in the Patterson v. Hewitt case, and the precedents are there cited. But in the instant case no such condition is shown, and no complaint based on such a feature is made. It is true that Perfecto, in whose breast all knowledge and in whose person all initiative appear to have been centered, died between the time of the execution to the deed to Field and the purchase by plaintiff, but he died only a few months after he conveyed to Field, and defendant can scarcely be charged with unconscionable delay because she failed to bring suit on her claim before Perfecto's death.

Upon the foregoing reasoning we find plaintiff suffered no wrong through the rulings of the trial court on the proofs offered by him to sustain his defense of laches, and that such defense cannot be maintained.

[5] 5. Defendant Anita A. Otero in her answer and cross-complaint set up title to an undivided one-half interest in the litigated premises. She filed her answer and cross-complaint in due time. Defendants Borradaile, Heyn, and Ambrosio Armijo failed to an-

swer, and certificates of default were entered against them, but no default judgments were taken. It appears that defendant Otero acquired the interests of her codefendants pendente lite by conveyances dater later than the filing of the suit. Counsel for plaintiff appears to have elected to try the case on the pleadings as they stood at the time of trial, and the evidence discloses that the defendant Otero had acquired and laid claim to an undivided one-half interest in the property. The objections that Mrs. Otero obtained the interests of her codefendants pendente lite and as a gift and without consideration are immaterial. This court will take the case as formed and concluded before the trial court.

[6] 6. Plaintiff, by his assignments of errors Nos. 35 and 37, alleges error on the part of the trial court in the exclusion of certain testimony offered. These exceptions are based upon offers of plaintiff's counsel to prove certain facts by witnesses then under examination. The offers are too general to advise the trial court of this court as to what the testimony to be elicited would be, and are offers merely of conclusions from undisclosed facts which may be presumed to have been in the mind of the attorney then examining the witnesses. The assignments of error are without merit. Williams v. Williams, 259 Mo. 242, 168 S. W. 616; United S. H. F. Co. v. Blue, 52 South, 604; Muntz v. Whitcomb, 40 Pa. Super. Ct. 553, 9 Enc. Ev. 162; Palatine Ins. Co. v. Santa Fe Merc. Co., 13 N. M. 241, 82 Pac. 363.

We have examined the other assignments of error and find nothing for consideration. Most of them relate to the refusal of the court to make certain findings of fact and conclusions of law offered by the plaintiff. The court in its judgment found the material and ultimate facts essential to support such judgment. Nothing further was required in the case.

For the reason stated, the judgment of the lower court will be affirmed, and it is so ordered.

PARKER, C. J., concurs.

## On Rehearing.

RYAN, District Judge. The argument of appellant on rehearing is devoted mainly to upholding the contention that the tax title on which he relies should be held effective, because, being in possession and holding adversely to the cotenants after ouster, he could build up a new and independent title by the purchase of the tax deed, which was founded upon a sale of the taxes antedating the acquisition of his interest in the land. This same matter was urged before, and is given thorough consideration in the very able opinion heretofore written by Mr. Justice BARNES. We have examined the cases upon which appellant relies, namely: Oswald v. Wolf, 129 Ill. 200, 21 N. E. 839; Sands v. Davis, 40 Mich. 14; Allen v. Dayton Hotel Co., 95 Tenn. 480, 32 S. W. 962; Lybrand v. Haney, 31 Wis. 230; Griffin v. Turner, 75 Iowa 250, 39 N. W. 294; Collier v Smith, 132 Ark 309, 200 S. W. 1008; Welner v. Stearns, 40 Utah, 185, 120 Pac. 490, Ann Cas. 1914C, 1175; Niday v. Cochran, 42 Tex. Civ. App. 292, 93 S. W. 1027; Stubblefield v. Hanson (Tex. Civ. App.) 94 S. W. 406; Boynton v. Veldman, 131 Mich. 555, 91 N. W. 1022; Olmstead v. Tracy, 145 Mich. 299, 108 N. W. 649, 116 Am. St. Rep. 299; Webster v. Webster, 55 Ill. 325; Stoll v. Griffith, 41 Wash. 37, 82 Pac. 1025.

We refrain from a prolix analysis of these cases; all were cited and considered by this court heretofore, and many carefully criticized in the previous opinion. We observe this, however, in regard to them, that they display a remarkable obscurity in the statement of basic doctrine and a looseness of expression which, in our opinion, is attributable to the fact that they confuse two distinct principles and apply them to distinct sets of facts indiscriminately. The first principle is this:

"It is the rule in most jurisdictions that the owner of the land cannot add to or strengthen his title by buying in at a tax sale." 3 Cooley on Taxation (4th Ed.) 2852; 1 Blackwell's Tax Titles, § 566; 46 L. R. A. (N. S.) 209; 26 L. R. A. (N. S.) 1167; Black on Tax Titles (2d. Ed.) 338.

The second is:

"Where land is owned by joint tenants, coparceners.

or tenants in common, and taxes are assessed upon it as a whole and it is sold for nonpayment of the same, neither of the cotenants can purchase a title at the sale which shall be paramount to that of his companions, or operate to dissolve the relationship. His payment is regarded as simply discharging the assessment, and it will inure to the benefit of all. He acquires no other or greater interest than he held before, except that he has a claim upon the others for reimbursement according to their respective shares." Black on Tax Titles, § 282.

See, also, 38 Cyc. 48, 78 R. C. L. 363; 3 Cooley on Taxation (4th Ed.) 2864.

Of the cases cited by appellant, supra, the following are concerned with the application of the first proposition, and not with the rule or with the exception to it where a purchaser is a tenant in common, viz.: Oswald v. Wolf, 129 Ill. 200, 21 N. E. 839; Lybrand v. Haney, 31 Wis. 230; Griffin v. Turner, 75 Iowa, 250, 39 N. W. 294; Collier v. Smith, 132 Ark. 309, 200 S. W. 1008; Welner v. Stearns, 40 Utah, 185, 120 Pac. 490, Ann. Cas. 1914C, 1175.

Under the first proposition the purchaser is unable to establish a tax title by the purchase of a tax deed by reason of his relationship to the land by way of possession and title. Under the second proposition he is estopped from asserting an independent title growing out of a tax sale purchase because of his relationship to others who have an interest in the land. It is apparent that the two principles are essentially different; yet it is deserving of notice that Oswald v. Wolf, which is authority only for the first proposition, is almost uniformly cited in the above cases as authority for an exception to the rule as to the equitable estoppel against cotenants asserting title derogatory to the title of the cotenancy.

The remaining cases, which have to do with an exception to the rule in regard to the purchase of a tax title by a cotenant, do not deserve any further attention than that expressed in the previous opinion. Some consider the matter upon the fact that a stranger purchased the tax title, which was a paramount title and

destructive of the cotenancy. Sands v. Davis, supra. Others are concerned with the right as between mortgagee and mortgagor. Allen v. Dayton Hotel Co., supra. Others are affected by the doctrine that the rule does not apply unless the tenancy is under the same instrument of title. Niday v. Cochran, supra; Boynton v. Veldman. In Olmstead v. Tracy, it was specifically announced that there was no tenancy in common. Stoll v. Griffith was upon the facts which clearly distinguished it from this case, in that the question arose upon the claim that the purchaser, whose title was defective because of an insufficient power of attorney from the grantor, became thereby a tenant in common; and Wright v. Sperry could have been determined solely upon the question of the estoppel as between mortgagor and mortgagee.

However unconvincing these cases may be as authority, the language employed by them is in support of the contention urged by appellant. With this contention, however, as it is applicable to the facts in this case, we do not agree. That one tenant may oust his cotenants is clearly the law in this jurisdiction, and, after ouster, certainly he may establish a title by adverse possession. It does not follow from this, however, that, even after ouster, he may rest his title upon the purchase of a tax certificate, as was done in this case, during the existence of a cotenancy. Equity and sound public policy forbid his so doing, since to hold the contrary would offer too great facility for an intriguing cotenant to convey by warranty deed to a stranger, thus ousting the cotenants, and immediately collude with his grantee to purchase an outstanding tax lien and thereon build up a paramount tax title. The lapse of time necessary for the establishment of the title by adverse possession is a protection to the cotenants that is entirely lacking, should the ability to rely successfully upon a tax title, as is contended in this case, be granted.

We adhere to the former opinion.

PARKER, C. J., and BRATTON, J., concur.