BERTHA WILLIAMS, Appellant, v. ELLA A. WIL-
LIAMS and JOHN T. WILLIAMS.

Division Two, June 23, 1914.

1. **EVIDENCE: Objection: Appeal.** To be of advantage on appeal
an objection to a question must be specific. An objection in
an action for dower based on a common-law marriage was not
sufficient which ran: "I know it has been held that the state-
ments of the deceased are admissible in evidence. I don't
think it is sound doctrine, and I am going to object to the wit-
ness testifying to what the deceased said."

2. ————: **Offer of Proof: Common-Law Marriage: Appeal.** An
offer to prove, in support of an allegation of common-law mar-
riage, that the alleged husband referred, in the presence of
witness, "to the subject of divorce, and referred to the plain-
tiff's getting a divorce, and also to the fact that there had been
a good many divorces in his family," does not enable the
Supreme Court to pass upon the materiality of the testimony
attempted to be offered, because it does not set forth what the
witness would say if permitted to answer and does not even
clearly show that it was a statement about a divorce between
plaintiff and the alleged husband.

3. ————: ————: **Materiality: Appeal.** From an offer that
a witness, in an action for dower based on an alleged common-
law marriage, would testify that the deceased had said in con-
versation with the plaintiff that certain property owned by the
deceased "was worth so much," it does not appear that the
evidence was material.

4. ————: **Stricken Out at Trial: Not Copied in Bill of Excep-
tions.** In order that the Supreme Court may consider the
admissibility of evidence stricken from a deposition at the
trial, the part stricken out must appear in the bill of excep-
tions.

5. ————: **Documentary: Stricken Out at Trial: Copied in Bill
of Exceptions: Equity.** Where in an equity suit documentary
evidence stricken out upon the trial is copied into the bill of
exceptions, the appellate court will consider so much of it as
was admissible, and the party asserting its admissibility at the
trial cannot possibly be injured by reason of the trial court's
ruling.

6. **SUIT FOR DOWER: Common-Law Marriage: Equity: Appeal:
Evidence.** Evidence in an equitable suit for dower *held* to
sustain a finding that there had been no common-law marriage
between the plaintiff and the deceased.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields,* Judge.

Affirmed.

*O. F. Karbe* and *S. C. Rogers* for appellant.

(1) The court erred in finding against plaintiff and for the defendants under the law and the evidence. Davis v. Stouffer, 132 Mo. App. 555; Cargile v. Wood, 63 Mo. 501; Dyer v. Brannock, 66 Mo. 361; Waddingham v. Waddingham, 21 Mo. App. 609; Busch v. Busch, 81 Mo. App. 562; R. S. 1909, secs. 345, 351, 355, 358. (2) The court erred in requiring plaintiff to prove, in order to make a case, an actual, open declaration of contract of marriage. Cargile v. Wood, 63 Mo. 501; Dyer v. Brannock, 66 Mo. 361; Blair v. Pattison, 131 Mo. App. 122; Waddingham v. Waddingham, 21 Mo. App. 609; Busch v. Busch, 81 Mo. App. 562; Imboden v. Trust Co., 111 Mo. App. 220; Plattner v. Plattner, 116 Mo. App. 405; Davis v. Stouffer, 132 Mo. App. 555. (3) The court erred in overruling plaintiff's motion for a new trial. Nelson v. Jones, 245 Mo. 579. (4) The court erred in excluding proper, legal, competent, relevant and material evidence offered by the plaintiff. Cargile v. Wood, 63 Mo. 501; Imboden v. Trust Co., 111 Mo. App. 220; Coy v. Humphreys, 142 Mo. App. 92; Sec. 6362, R. S. 1909; Holloway v. Kansas City, 184 Mo. 19; Davenport v. Hannibal, 108 Mo. 471. (5) The court erred in permitting defendant, John Williams, to testify as to declarations by deceased, Walter John Williams, without the presence of plaintiff or other person. Collard v. Busch, 138 Mo. App. 94; Bishop v. Brittain Inv. Co., 222 Mo. 699; Imboden v. Trust Co., 111 Mo. App. 220. (6) The court erred in finding against plaintiff and for defendants because defendants by their objections to certain documentary evidence admitted the common-law marriage. (7) Because the court erred in ad-

mitting, over the objection and exception of plaintiff, improper, irrelevant, illegal, incompetent and immaterial evidence offered by the defendants.

*James Booth* for respondents.

(1) The trial court saw the witnesses, observed their demeanor while upon the stand and his opportunity for judgment on the weight of the credible evidence in the case was better than that of an appellate tribunal that has only the cold record before it with no opportunity to watch the demeanor of the witnesses. Speaking to a similar fact in a similar case where it was charged that the appellate court ought to review the evidence and reverse the finding of the trial court this court thus declared the rule: ''In determining whether he erred in so finding it must be borne in mind that he had the witnesses before him and could observe their manner of testifying and had exceptional opportunities to weigh their evidence.'' Topper v. Perry, 197 Mo. 549. (2) Where, as in this case, the judgment of the trial court is right upon the whole record, the various rulings of the trial court, even though error (which is controverted), are immaterial and its judgment ought to be affirmed. Bank v. Tuttle, 144 Mo. App. 249; Gibbs v. Haughowout, 207 Mo. 384. (3) The rule is well established in this State that the statements and declarations of Walter Williams as to his relations with plaintiff were admissible as evidence in this case. Property rights have been vested and divested on the strength of these decisions and it is too late now to question the correctness of the rule. Topper v. Perry, 197 Mo. 531; Imboden v. Trust Co., 111 Mo. App. 235. (4) Cohabitation and reputation are at best only presumptive proofs; the trial court could have found these facts and still found as a matter of fact there was no marriage. Topper v. Perry, 197 Mo. 531. Plaintiff's case rested

entirely upon the inference to be drawn from evidence of cohabitation. The doctrine of presumption had no abiding place in this case. Presumptions of fact become inoperative when the actual facts are disclosed. Schaub v. Railroad, 133 Mo. App. 444; Stone v. Perkins, 217 Mo. 586. (5) The admission of improper evidence is not properly before this court and this court should disregard such assignment of error. True it is charged in appellants brief, "that the court erred in excluding proper, legal, competent, relevant and material evidence offered by the plaintiff." Nowhere does the brief "distinctly and separately allege the errors committed by the trial court" as required by rule 15 of this court. At best the purported assignment of error as to the admission of evidence is an invitation to the court to go through some two hundred pages of the record and perform a duty that the rule required counsel to perform for himself. (6) In this case while there may have been some evidence of cohabitation there was no general reputation concerning the matter. The evidence was insufficient to make a prima-facie case. Topper v. Perry, 197 Mo. 531. (7) There was no evidence of a marriage by words of the present. This was required and having failed to furnish such proof the finding was properly against the plaintiff. Topper v. Perry, 197 Mo. 531.

WILLIAMS, C.—This is a suit in equity by which plaintiff seeks to establish her dower interest in certain land, at one time owned by her alleged common-law husband, Walter J. Williams, now deceased, and to set aside, on the ground of fraud, a certain conveyance of said land made by her said husband to one of the defendants herein. The answer contained a general denial and also denied that plaintiff was, at any time, the wife of said Walter J. Williams and further alleged that in the year 1904 said Walter Williams was the owner of the real estate described in the peti-

tion and on that date he voluntarily conveyed the same in fee to the defendant Ella A. Williams. The reply was a general denial. The evidence on the part of the plaintiff tended to show that in 1903 plaintiff and Walter J. Williams began living together in the city of St. Louis, each being about thirty-three years of age. Up to this time neither of the parties had ever been married, but plaintiff had a daughter then eight years of age, who lived with them. It is not claimed that Walter Williams was the father of this child, but it is claimed that its father's name was Bauman. Williams was a surveyor doing surveying work mostly for railroads, and his occupation kept him out of the city a greater portion of the time, but generally he would be at home from one to two days each week. During this time plaintiff introduced Williams to some of her neighbors as her husband and, on some occasions, he referred to her as his wife. Plaintiff's little daughter called Williams father, papa and daddy. Plaintiff and Williams slept in the same room while he was at home. There seems to have been some question in the minds of some of plaintiff's relatives and neighbors as to the relationship existing between plaintiff and said Williams. Three of plaintiff's witnesses testified that they heard Williams say on different occasions, "In the eyes of God, we are man and wife," or they were "as good as married, in the eyes of God" and that they were "already married in the eyes of God." They continued this relationship until sometime in August, 1905, when Williams' work called him to Haynesville, Louisiana, and plaintiff and her daughter followed him there, where they lived for a short time at a hotel and when talking to some of the people they met there, referred to each other as husband and wife. After they had gone to Louisiana, plaintiff's brother-in-law wrote Williams a letter concerning his relationship with the plaintiff and Williams replied telling the brother-in-law not to worry that he would take care of his wife

and little girl and that they would be legally married on the way back. They returned to St. Louis from Louisiana in 1905 and continued their relationship in St. Louis somewhat similar to what it was before going to Louisiana. Some people called plaintiff Mrs. Williams and others called her Mrs. Bauman. At one time in 1905, said Williams with plaintiff and her daughter rode one trip on the Iron Mountain Railroad upon a pass issued to "W. J. Williams, Wife and Child." Plaintiff's maiden name was Bertha Fisher. Several letters written at different times from Walter Williams to the plaintiff were offered in evidence. In these letters he addressed the plaintiff as "Dear Birdie," and generally referred to her in the body of the letter as "sweetheart." In one letter written from Louisville, Georgia, February 20, 1908, he says: "As soon as I get some money, I am going to have my wife and child down here. Do you hear, young lady?" In a letter from Ft. Smith, Arkansas, dated January 27, 1904, he writes: "I am getting anxious to have the job get over now as I want to see my wife and baby." The plaintiff's evidence further tended to show that during the time of the existence of this relationship plaintiff was working in the capacity of a professional nurse, doing professional nursing, whenever she had work of that kind to do. The evidence also shows that at different times Walter Williams when away from St. Louis would send plaintiff money. Williams became the owner of the lot here in controversy in 1894 and in 1904 deeded the same to his mother, one of the defendants herein. This deed, however, was not acknowledged until September 1, 1909, and was not recorded until September 2, 1909. Williams died September 8, 1909, at a hospital in the city of St. Louis. The evidence on the part of defendant was to the following effect: Defendant John T. Williams testified that he was the father of Walter J. Williams, deceased; that he first met plaintiff, December 18, 1905, at the

Union Station in St. Louis; that just before meeting her at the Union Station, his son Walter told him that a woman with whom he had cohabited had demanded marriage; that the woman referred to was plaintiff; that he had consented to marry her and was to meet her at the Union Station and they were to go down the railroad to some town to be married; that he had changed his mind and stated that he could not marry her and that if he did he would go crazy in six months; he told his father that he was not the cause of her downfall but that he had first met her in a rooming house. Walter asked his father and another man by the name of Herbert Abrams, a friend of Walter's, to go to the Union Station and there meet plaintiff and explain to her that he could not marry her. Witness said that he and Mr. Abrams went to the Union Station and there found the plaintiff waiting with some of her relatives. Witness asked plaintiff if her name was Miss Bertha Fisher and she said ''Yes'' and further stated in reply to questions that she was to meet Walter there and that they were going down the road to be married. Witness than told her what Walter had said and she turned away and walked back to her friends. At plaintiff's solicitation, witness went to see her a second time at her house on January 18, 1906, when plaintiff claimed to be suffering from a hemorrhage and wanted to know if witness had heard from Walter. Witness next saw plaintiff down town in 1909 a short time before Walter's death. Plaintiff asked witness if he recognized her and he said, ''Yes, you are Bertha Fisher.'' At this time, Walter was sick at defendant's home and witness told plaintiff that they were going to take him to the hospital and plaintiff said she would like to nurse him and gave witness her card which read as follows: ''Mrs. B. Bauman, 2854 Missouri avenue, Victor 675R.'' Later plaintiff came to the hospital and nursed Walter during the last two weeks of his sickness. After Walter's death, plaintiff was at witness's

house and said that "a lawyer had come to her the next morning after Walter's death and offered to secure a common-law marriage agreement and that she had ordered him out of the house." And that plaintiff said "she made no such claim." Later, on September 29, 1909, plaintiff came to defendant's house to see about receiving payment for the nursing. Plaintiff said that fifty dollars would be satisfactory and defendant gave her a check for that amount. The check was made payable to Miss Bertha Bauman and was afterwards endorsed by plaintiff and cashed by her at the bank. At the time of receiving this check, plaintiff executed the following receipt to defendant: "Received. St. Louis, September 29, 1909, of Jno. T. Williams the sum of fifty dollars in full of all demands for nursing, etc., of his son, Walter Williams. (Signed) MRS. BERTHA BAUMAN." Plaintiff's signature on the receipt was identified by her daughter while a witness in behalf of plaintiff. When plaintiff presented the check at the bank, the cashier knew her under the name of Bertha Fisher and upon being interrogated by the cashier, plaintiff stated that she had been married and taken the name of Bauman. Plaintiff attended Walter's funeral. One of defendants' witnesses testified that she talked to plaintiff as they were on a car coming back from the funeral and that plaintiff stated that she and Walter were engaged to be married and were to have been married the next month. Herbert Abrams testified that he went with Walter's father to meet plaintiff at the Union Station at the time testified to by John T. Williams. This witness also stated that Walter had many times told him that he was not married to the plaintiff. Defendant Ella A. Williams, the mother of Walter, testified that Walter lived with them but that he would be away occasionally; that she first met plaintiff at the hospital during Walter's last sickness. The deed from Walter to his mother was acknowledged seven days before his death. The ac-

Williams v. Williams.

knowledgment shows that he declared himself at that time to be single and unmarried. The case was heard by the circuit court of the city of St. Louis, resulting in a finding and decree in favor of defendants and the dismissal of plaintiff's bill. Plaintiff perfected an appeal to this court.

I. It is contended that the court erred in permitting defendants to introduce testimony as to statements or declarations made by said **Common-Law Marriage: Objection to Evidence.** Walter J. Williams concerning his relationship with plaintiff. At the time this testimony was admitted, appellant's attorney made the following objection: "I want to offer this objection; I know it has been held that the statements of the deceased are admissible in evidence. I don't think it is sound doctrine, and I am going to object to the witness testifying to what the deceased Walter Williams said:" The court overruled the objection and exception to the ruling was saved. The above was not a sufficient objection upon which to base error. An objection to a question should be specific so that the trial court may have a chance to pass upon the exact point which is intended to be urged. [Kinlen v. Railroad, 216 Mo. 145; O'Neill v. Kansas City, 178 Mo. 91; Schmidt v. St. Louis Ry. Co., 163 Mo. 645; Primm v. Raboteau, 56 Mo. 407.]

II. It is further contended that the court erred in excluding "proper, legal, competent and relevant and material evidence offered by plaintiff." **Rulings on on Evidence: Equity: Appeal.** In aid of this assignment, it is contended that the court erred: (1) in excluding testimony of witness Marie Bauman as to what Walter Williams said with reference to plaintiff's securing a divorce; (2) in refusing to permit the same witness to testify to what deceased said about the title to the property; (3) in excluding

portions of the testimony of witness Powell; (4) in striking out a portion of the testimony of witness Dr. Waller; (5) in excluding plaintiff's exhibits D, H and I. The offer to prove under (1) above does not set forth what the witness would say if permitted to answer the question and does not even clearly show that it was a statement about a divorce between plaintiff and Walter Williams. We are therefore unable to pass upon its materiality. [Hickman v. Green, 123 Mo. 165; Shelby County Railroad v. Dimmitt, 235 Mo. 489, and cases therein cited.] The offer to prove under (2) above was that the witness would testify that "Williams said the property was worth so much." It does not appear that this testimony was material. As to point (3) above, the testimony was in deposition form but appellant has failed to copy into her bill of exceptions the part stricken out and we cannot determine as to its admissibility. As to points (4) and (5) above the testimony was in deposition and documentary form and the portions which the trial court ruled should be stricken out are set forth in full in the bill of exceptions and this being a suit in equity and the review here in a sense a trial *de novo* such portions as are properly admissible may be considered by this court and plaintiff could not possibly be injured by reason of the trial court's ruling thereon.

III. It is further urged that the Evidence of "court erred in finding against plaintiff Common-Law Marriage: and for the defendants under the law and Appeal in the evidence." Equity.

This case was tried as a suit in equity and while we are not bound by the findings or conclusions reached by the learned trial court, where we find the evidence does not warrant such finding, yet it is fully recognized by all the authorities that, since the trial court has an opportunity to see the witnesses in person, while we see but the printed record, consid-

erable deference is, and should be, given to the findings of the chancellor. After carefully considering and weighing all the testimony given in the case we are not prepared to say that the court erred in finding that plaintiff and Walter Williams were not husband and wife. The burden was upon plaintiff to prove the marriage. It was not claimed that a statutory marriage existed but an attempt was made to establish a marriage under the common law. It is true that there was evidence tending to show the cohabitation of plaintiff and defendant and some slight evidence that they were reputed to be married and that deceased referred to plaintiff as his wife and she to him as her husband both while living at St. Louis and while stopping a short time at the hotel in Louisiana. On the other hand the evidence upon the part of the defendant tends to prove that they were not married.

Plaintiff's evidence to the effect that plaintiff's little girl called Williams father, and that plaintiff introduced him as her husband and he referred to her as his wife, in conversations occurring at the house where they lived, does not carry much weight when it is remembered that the plaintiff's little girl between ten and fifteen years old was living with them. It is not likely that plaintiff or even Williams would desire to have this little girl of tender years know that they were living together unlawfully, and such statements are just as consistent with the theory that they didn't want the little girl or their neighbors to know of their illicit cohabitation as with the theory that they were declarations of an existing fact. The same could be said as to the testimony that they referred to each other as husband and wife while talking to the hotel keeper and his wife and a few other people with whom they came in contact while stopping for a few months at the hotel in Louisiana. It appears from the evidence that the hotel was a respectable place and therefore their being able to find lodgment there undoubtedly de-

pended upon the impression given out by them that they were married. Furthermore, it appears from the testimony offered by plaintiff that some of her relatives and neighbors entertained doubt concerning the marriage. This becomes apparent when it is recalled that plaitniff's brother-in-law wrote to Williams in Louisiana and according to his testimony received a reply from Williams that they would be "legally married on their way back;" and further from the testimony of three of plaintiff's witnesses to the effect that they had heard Williams make the statement at different times that he and plaintiff were "already married in the eys of God," the statement itself clearly showing that the legality of their relationship was being questioned by her relatives and neighbors.

The only public declaration made by Williams, the authenticity of which is not questioned, is contained in the deed which plaintiff seeks to set aside. In acknowledging this deed, about one week prior to his death, plaintiff declared himself to be single and unmarried. It further appears from the evidence that Williams' work kept him away from home the greater portion of the time; that upon his returns to the city, he spent a portion of a day or sometimes two days with plaintiff and then would go to the home of his father and mother for a short time. His mother testified that during this time he was making his home with them. He was at the home of his father and mother prior to being moved to the hospital. Plaintiff under the name of Mrs. Bertha Bauman applied to deceased's father to secure the job of helping nurse him. Plaintiff nursed him during the daytime for about two weeks next prior to his death. She attended the funeral and later called at defendant's home to receive pay for her nursing. She received a check for fifty dollars from defendants, payable to the order of Miss Bertha Bauman, and executed a receipt for the same signing her name as Bauman. Later she presented the check to

the bank and endorsed the check "Miss Bertha Bauman, 2854 Mo. Av."

It is true that some of plaintiff's testimony, when standing alone, tends to prove the existence of the marriage but when all the evidence is considered it strongly appears that the greater weight of the evidence is on the side of the contention that they were not husband and wife.

The subject of common-law marriage was fully discussed by this court in the case of Topper v. Perry, 197 Mo. 531, and in the case of Bishop v. Brittain Investment Company, 229 Mo. 699. It is therefore unnecessary that the subject be further discussed herein.

The judgment is affirmed. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.